It appears that on June 27, 1934, the plaintiff's salesman, Hills, called on the defendant for the purpose of selling him some nursery stock. He claims to have made two separate sales, one for $44.20 to be delivered at once, and one for $747. to be delivered in the Spring of 1935. Both the original and carbon copy of the smaller order were signed by Hills, as representing the plaintiff, and by Stanley Turner, the defendant's gardener, as representing the defendant. The original of the larger order was also signed by Hills, as representing the plaintiff, and by Turner as representing the defendant, but the carbon copy left for the defendant was not signed by either. The defendant claims that he authorized Turner to sign, in his behalf, the smaller order, but not the larger one. He also claims that the $747. order was not an order at all but merely a reservation of the stock for the following Spring, to be purchased, if he so desired, at prices prevailing on June 27, 1934. Within a month, the defendant wrote the plaintiff cancelling "the entire order . . . . placed with your Mr. Hill", and that he has decided "that he would prefer to place the order next spring". He also wrote that "upon receipt of a letter from you acknowledging cancellation we will forward our check to cover purchases made by us this spring". This letter was written by the defendant after he had received a request from the plaintiff to confirm the order. The plaintiff made no reply to this letter, and, at no time, up to the date of attempted delivery did it either acquiesce in or reject the defendant's attempted *Page 278 
cancellation, although plaintiff's representatives and the defendant had some conferences pertaining to other matters after the cancellation. Prior to May 10, 1935, the plaintiff brought the stock to the defendant's premises, but his employees refused, on instructions from the defendant, to permit it to be unloaded. The stock was, thereupon, taken to a spot about a half mile from the defendant's house and there unloaded in an open field. As soon as it was discovered, the defendant telegraphed the plaintiff his refusal to accept, and that the stock would be held at the plaintiff's risk.
The conflicting evidence adduced by both sides is illustrative of the difficulties frequently encountered by courts in deciding questions of fact. Inventors have, from time to time, announced the perfection of devices designed to ferret out prevaricators who appear in court as witnesses. Were such an instrument available to the Court, its road would be comparatively easy. In the absence of a mechanical "lie detector", however, the Court will have to resort to its own best judgment, after observing the witnesses, their demeanor on the stand, and the plausibility of their stories. There are also striking physical facts which weigh heavily with the Court.
Following this course, the Court says frankly that it regards with suspicion the combined testimony of the plaintiff's witnesses, Hills and Turner. Their stories are are so exactly similar that the Court has no doubt that Turner's recollection of what happened about a year and a half ago was materially influenced by prompting from Hills just before the trial. His statement on the witness stand that the facts all came back to him only when he saw his signature on the contract does not ring true, and was obviously made for the purpose of explaining away a different story told by him to the defendant and others in New York some time ago.
So far as Hills is concerned, he has not explained to the satisfaction of the Court why his order for $44.00 bore his and the gardener's signatures on the carbon copy, whereas the carbon copy of the order upon which this suit is based is without either signature, although both signatures appear on the original. If he and the gardener both signed the original at the time it was filled out, the imprint of their signatures would necessarily have passed to the carbon copy. *Page 279 
The absence thereof lends color to the defendant's claim that the so-called "order" was merely a reservation to protect him against price increase. What Hills left for the defendant was not a valid signed order which would put the defendant on notice that an obligation had been created for him by his gardener, but an unsigned carbon copy of a list of nursery stock for spring delivery, which without the plaintiff's signature, was even unenforceable against it.
Under the circumstances, therefore, the Court finds that the instrument in suit (Plaintiff's Exhibit A) is not an order for the goods therein described, and consequently does not give the plaintiff any cause of action.
In view of the finding of facts above set forth, it does not seem necessary to pass upon the questions of law raised by the plaintiff. However, in order that the plaintiff and its counsel may be apprized of the Court's views on those questions, and so that they may be properly raised in the event of an appeal, the Court will gladly undertake the additional task.
The Court is of the opinion that if an order had been given, its cancellation by the defendant within a month from its date gave the plaintiff the right to sue for damages resulting from the breach of contract, and that such damages would be limited to the difference between the contract price of the stock at the time of the sale and the market price at the time of delivery provided for in the contract, which was "Spring of 1935". He is not permitted, merely because the breach is anticipatory, to enhance his damages by unreasonably omitting action that would prevent harm. Restatement of theLaw of Contracts, Section 338.
The Court has carefully studied the cases cited by the plaintiff's counsel in his brief, but is of the opinion that they sustain, rather than contravene, its conclusions.
The cases of Wells vs. Hartford Manilla Co., 76 Conn. 27;The Home Pattern Co. vs. Mertz, 86 Conn. 494, and Lewisvs. Scoville, 94 Conn. 79, stand for the proposition that the repudiation of a contract by one party does not put an end to the contract unless there is acquiescence on the part of the other party to the repudiation. The first two cases hold that the plaintiff is entitled to recover damages for the breach *Page 280 
of contract for unshipped goods as well as the purchase price for such goods made specially for the defendant before the cancellation. The Court is in complete accord with those decisions and would rule for the plaintiff if the evidence disclosed that there was a contract and that pursuant thereto the plaintiff had manufactured or grown the articles in question before the receipt of a cancellation. The facts, however, in the instant case do not warrant such a conclusion.
The case of Lewis vs. Scoville, 94 Conn. 79, is readily differentiated from the instant case. In that case there was a present sale with a part payment accompanying the order, with nothing further to be done by the plaintiff except to make delivery. It was actually a completed sale with title passing to the defendant upon delivery of the books to the carrier.
The views of the Court are more clearly enunciated inSection 4684, General Statutes, 1930.
 "Action for damages for non-acceptance of the goods.
When the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for non-acceptance. The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract. When there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances showing proximate damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept. If, while labor or expense of material amount is necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand, but the profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages." *Page 281 
It seems to the Court that the remedy, if a breach had occurred, is contained in the above section. Its conduct in leaving the goods in an open field about a half mile from the defendant's house cannot be justified under any principle of law known to the Court.
 The issues are found and judgment may be entered for the defendant to recover his costs.